## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 0090 1:22CR00314-001 |
| | ) | |
| DANIEL LEYDEN, | ) | Judge Trevor N. McFadden |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### DEFENDANT DANIEL LEYDEN'S SENTENCING MEMORANDUM

Defendant, DANIEL LEYDEN, by and through his attorney, Thomas More Leinenweber, respectfully requests, pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005), its progeny, and 18 U.S.C. §3553(a), that this Honorable Court impose a sentence of twelve months of house arrest followed by thirty-six (36) months' probation and 200 hours of community service. In support, Mr. Leyden states as follows:

## I.    INTRODUCTION

Defendant Daniel Leyden comes before the Court for sentencing after having pled guilty to a single count of Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). This statement is submitted in order to allow the Court to become more familiar with the defendant, Daniel Leyden, prior to his sentencing. Attached are a number of letters from Mr. Leyden's friends, family members, and colleagues, all of which request that the Court impose the most lenient sentence permitted, due to the various reasons stated therein. A review of these letters will demonstrate to the Court that Mr. Leyden's character and nature suggest that justice will be served by sentencing him to probation.

On January 6, 2022, a large crowd of people gathered to hear then-President Donald Trump hold his last rally on the National Mall. The theme of the rally was "Stop the Steal," which was a clear reference to interrupting the certification of the presidential election results from November 6, 2020. It is estimated that over 10,000 Americans from all over the country came to hear and see the president. When he concluded speaking, many of these thousands of people went home. However, many thousands decided to take the president's encouragement and go to the Capitol and protest their discontent with the election results and their legitimacy. As we now know, many of these protesters were intent on rioting and obstructing the election process through violent, destructive, and illegal means. Many came with weapons, plans, and agendas to cause utter chaos in organized numbers. Daniel Leyden was not one of those people.

Daniel Leyden went to Washington to see Donald Trump one last time as president. He accepted the election results and its process. He respected then, as he does now, the many court decisions which dismissed the many electoral challenges around the country. When he came to Washington on the morning of January 6, 2021, he never anticipated that he would be on the East Steps of the Capitol pushing against bicycle barricades manned by Capitol Police.

Leyden got swept away by the mob, and with it, so too did most of his better judgment and character. He is mortified by his behavior and terribly regrets his conduct. He continues to be contrite and understands his conduct will come with criminal sanctions.

Because his behavior is clearly distinguishable against those others who were found guilty for their actions on January 6, it is respectfully requested Mr. Leyden be sentenced to twelve months of house arrest followed by thirty-six (36) months' probation and two hundred hours of community service.

## II.    PRESENTENCE INVESTIGATION REPORT

### A.    Pre-sentence report Guidelines

The Pre-Sentence Report (PSR) guidelines are calculated as follows: the Defendant pled guilty to conspiracy to Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).   The Defendant's preliminary guideline base offense level is 14 pursuant to USSG §2A2.2(a). That level is increased by 4 levels because a deadly weapon was used, as proposed by the government and Probation pursuant to USSG §2A2.2(b)(2)(B). An additional 3 points are added because a victim sustained bodily injury, pursuant to USSG §2A2.2(b)(3)(A). An additional 6 points are added because the victim was a law enforcement officer, pursuant to USSG §3A1.2(c)(1). Finally, an additional 2 points are added because the victim was physically restrained in the course of the conduct, pursuant to USSG §3A1.3. That level is reduced by 3 points for acceptance of responsibility and prompt plea. The Defendant has 0 criminal history points, and his criminal history level is category I. Therefore, the PSR has set the guideline level at 26 with an accompanying sentencing range of 63-78 months in prison. The statutory maximum is 96 months. 18 U.S.C. §111(a)91).

### B.    Objection to Enhancement for Use of a Deadly Weapon Pursuant to USSG §2A2.2(b)(2)(B)

While there is little question that the bike racks being used by the Capitol Police on January 6 as barricades to stop people from proceeding towards the Capitol *could* be used as a deadly weapon, they were not used by Mr. Leyden in that manner. Image 1 shows Mr. Leyden backing away from the barrier. *See Image 1.* Images 2-5 show what Daniel Leyden was doing: turning his back to the barricades and pushing against it. *See Images 2-5.*  It is clear from the images and other evidence, that while Daniel Leyden was pushing against the barricades, even slightly as he was doing, was committing a crime. What is equally clear is that the barricades were not being used by Daniel Leyden as a weapon. The evidence shows that he was not pushing against the barricades with anger or any real effort whatsoever. He is unlike virtually all of the other defendants who picked up the barricades and literally threw them at the police officers. Therefore, Daniel Leyden respectfully

2

disputes that he used a deadly weapon and believes that the adjusted guideline level is 22 and that the range of sentencing range should be 41-51 months' imprisonment.



*Image 1*  Daniel Leyden can be seen in the middle of the picture wearing a green plaid coat.

### III.     SENTENCING LETTERS

The Court is familiar with the use of letters as a vehicle to provide additional information to the Court in the sentencing process. Although there are other methods of conveying information, this remains an efficient process and one that does not, in my opinion, suffer too much from the fact that the writers are not directly available for examination. I imagine that the Court finds that the true character of the writers comes clearly through. Many of the authors of the letters will be present for sentencing and will, if the Court wishes, be available for the Court's questions.

There is some similarity in the letters. A review of the letters shows that they are genuine; they are unedited in any way. Usually I find that, and I think this is the case here, despite similarities in *form*, the content of the letters clearly reflects the unique view of the writer.

### IV.     RELEVANT FACTUAL BACKGROUND

#### A.      Offense Conduct

Mr. Leyden's history and the circumstances of this case demonstrate that it is not necessary to imprison him to satisfy the purposes of punishment. Evidence of a defendant's history and characteristics "is clearly relevant to the selection of an appropriate sentence." *Pepper v. United*

*States*, 131 S. Ct. 1229, 1242 (2011) (citing § 3553(a)(1)). *Pepper* emphasized that a sentencing court must "'consider every convicted person as an individual,'" *Pepper*, 131 S. Ct. at 1240 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)), and must fashion a punishment that "fit[s] the offender and not merely the crime," *Pepper*, 131 S. Ct. at 1240 (citations omitted).

The Government's Version and the PSR calculates the advisory guideline range at the anticipated offense level of 26, which, when combined with the criminal history category of I, results in an anticipated advisory sentencing guidelines range of 63 to 78 months' imprisonment. Mr. Leyden believes that there should be no enhancement for the use of a deadly weapon and that the offense level should be 22 and the guideline range should be 41 to 51 months' imprisonment.

As stated previously, Mr. Leyden attended the "Stop the Steal" speech by then-President Trump. At some point, Mr. Leyden walked towards the Capital. Mr. Leyden had no weapons, wore no camouflage, helmet, goggles, or protective gear of any kind, and had no intention of causing any trouble. Far from being dressed for battle, Mr. Leyden was dressed in a winter coat and was wearing a muffler on his head. Still, because it was a cold day and he was not dressed warmly enough for the cold, his main motivation in walking was to keep warm. The videos from the day of the event show that Mr. Leyden was one of the first people to meet the barricade. *See Image 2.* If he could relive that day, he would turn around and go home. He did not but his actions when he came to the barricade are easily distinguishable from other in the "Peace Circle." The evidence shows that Mr. Leyden was not yelling, was not threatening anyone, and never touched any of the police officers at the Capitol. What he did was to turn around and lean against the metal barricade. *See Image 3.* This was approximately 10 seconds after reaching the barricade. Others around him were violently pushing the barricades into the officers that were manning it. *See Images 3-5.* From these images it appears that Mr. Leyden was at the barricade for approximately 57 seconds. Mr. Leyden acknowledges and understands that what he was doing at the time was illegal – he was clearly breaking the law. But the manner in which he was doing it was a far cry from the others around him. By pushing the barricade, even in the manner in which he was doing, was a criminal act. A review of the video evidence further strengthens Mr. Leyden's contention that what he was doing, while illegal and wrong, was vastly different from almost all of the other defendants charged for their actions on January 6.



*Image 2.* Mr. Leyden can be partially seen as the third figure from the right wearing a green plaid coat.



*Image 3* Mr. Leyden can be seen with his back partially turned toward the camera and away from the barricade.



*Image 4* Mr. Leyden is seen here with his back towards the barricade.



*Image 5* Mr. Leyden can been seen here with his back against the barricade pushing back on it.

We believe that a sentence well below the guidelines is supported by Mr. Leyden's history and characteristics, and we submit that a sentence of probation is the appropriate sentence. This sentence is supported by: (a) Mr. Leyden's exemplary family, community, and employment history; (b) Mr. Leyden's lack of criminal history; (c) his unlikelihood of recidivism; and (d) the collateral consequences of conviction which Mr. Leyden has already suffered.

### B. Personal Background of Daniel Leyden

Mr. Leyden, who is 56 years old, was born to Irish immigrants Mary and Joseph Leyden in Chicago. He has four brothers, including a twin brother David. He was raised in a working-class neighborhood on the Southside of Chicago, an area where crimes and gangs were present, Mr. Leyden, luckily avoided those pitfalls, as he was born to a happy middle-class family. His family is extremely close, and he and his brothers were brought up in a household that emphasized hard work, love of God, love of country and service to others. Dan graduated from St. Rita High School in Chicago and 1985 and within two weeks, he and his twin brother boarded an airplane for the first time in their lives to fly to United States Marine Corps bootcamp in San Diego.

Dan's stint in the Marines ended early as received an honorable discharge due to medical reasons in 1986. He then completed an apprenticeship with the International Brotherhood of Electrical Workers and became an electrician, a job which he continues to do. Dan worked as an electrician

for the Chicago Park District from 1999 until 2022, when he was discharged from the Park District due to his participation in the instant case.

Dan met the love of his life, Linda, and they were married in 1998. After seven years together, the couple adopted daughters Elena and Tatyana around Christmas 2005. Elena was four years old, and Tatyana was seven years old when Dan and Linda adopted them. It was quite an adjustment for the family as they girls spoke no English and at first, were fearful of men due to their years in a Russian orphanage. From this time on, Dan's focus was always on his family and what was best for them. At some point, it was discovered that Elena suffered from intellectual disabilities, and she needed both private schooling and a driving service to take her to and from school. *Presentence Investigation Report ("PSR")*, p. 10, §59. As with everything to do with his family, Dan made sure that his daughters had everything they needed. Today, Elena lives with her comfort dog in a small home that her parents purchased for her, and she works cleaning homes in Crawfordsville, Indiana. Tatyana is currently receiving a master's degree in education from Eastern Illinois University.

Despite losing a job that he not only was good at, but loved, Dan continues to work as an electrician as well as a person who is called upon by family and friends to help out with anything that is needed.

A multitude of Mr. Leyden's friends and family members have written letters of support on his behalf. Dan's twin brother Dave, writes:

> Our parents, Joseph and Maureen Leyden immigrated to the United States from Ireland in the 1950's and raised five sons. We all attended St. Rita Grade School and all five of us graduated from St. Rita High School. Our parents taught us to center family life around God, to allow Him into our homes and our life – as individuals and as a family – and let Him take the lead. Following those guidelines, my brothers and I have continued our parents' legacy with an abundance of faith and strong marriages that will endure the test of time.

> Our parents wanted to make the trip to Washington, but due to their age and health conditions, it was not possible. They are heartbroken over this situation and wanted me to ask for leniency for their sons. I am afraid of how this will affect them. My mom had a stroke a few years back and lost vision in one of her eyes. My Dad was hospitalized in February with Covid for 14 days and we nearly lost him. They are very fragile, and it really takes each and every family member to care for them.

> After high school, my twin brother Dan and I joined the United States Marine Corps on the buddy program. The buddy program allowed Dan and I to complete the 13 weeks of rigorous training together. I was not as prepared for the Marine Corps training as my brother Dan. He continued to motivate and support me throughout our journey.

> When my daughter with special needs was born in 1998, it was touch and go for a while and I will always remember my twin brother Dan was the first person at the hospital. I chose my brother Dan to be her Godfather because I knew that he would be there for her,

if I could not. Uncle Dan is Molly's biggest advocate and her favorite uncle, the empathy he has for Molly and people with disabilities is remarkable.

My brother Dan is the type of person, who thinks of others before himself, he is a man of faith and honor. My hope is that you see him and our family, for who we really are, good people with good values.

*Letter of David Leyden, undated*, attached as part of Group Exhibit A.

Another brother, Mike Leyden, writes of Dan's big heart:

> When Dan was in high school, he befriended a young neighbor who had some mental health issues, and little to no support from his own family. Dan treated the man with kindness, which was something this man desperately needed and eventually was able to find him a decent apartment from someone he knew. Keep in mind, society tends to frown upon those with mental health problems and, also, those that associate with them. But, Dan did not let that stand in his way, and now that I think about it, that was pretty special because Dan was very young at this time.

> I also remember, not too many years ago, that Dan had an elderly neighbor, who lived alone and had no real connection to any family or friends. Dan would help him around his home until the man became ill and was admitted to the hospital. Dan went to visit him and was saddened when he realized that the man did not have "suitable" undergarments. So, Dan made it a point to purchase some new undergarments before the next visit. The man did pass away and it was later learned that he was actually quite wealthy, to the point that he left the Church, well over one million dollars. The joke was that this man could have bought the whole neighborhood undergarments, but Dan just said that everyone deserves clean underwear at the end of their day.

> However, I think the number one "big heart" story has to be the adoption of his two daughters. I remember the stories and all the hoops that Dan and Linda were jumping through while trying to complete the adoptions. Each setback and delay was followed by another setback and delay. It was a point where many others simply would have given up, but they stayed the course, brought the two girls home and provided them a new life and family.

> Dan has all the qualities that have made him a good son, brother, husband, father, and friend to many. He is kind, caring, sympathetic, honest, generous, loving and above all, he has a good moral compass which keeps him true to his faith.

*Letter of Michael Leyden, dated July 9, 2023*, attached as part of Group Exhibit A.

Sister-in-law, Catherine Leyden, writes of how Dan lives his faith:

> Dan is a man of strong faith, but more importantly, Dan lives his faith! Dan is an individual that puts the needs of others before his own. I've witnessed it over the years, as he selflessly

cared for an ailing neighbor, the elderly person that needed the snow removed, grass cut and so much more. Dan was always willing to lend a hand where it was needed. I have witnessed Dan's compassion for those that have fallen on hard times. He goes out of his ways of improving the lives of these individuals. He does all this with a big heart and expecting nothing in return. I have come to admire the man Dan has become. I chose Dan to be the Godfather to my daughter 29 years ago, because I truly believed then and still believe now that he possesses all the qualities necessary to be a positive influence in my daughter's life. He has lived up to my hopes and expectations, and I know he will continue to do so.

*Letter of Catherine Leyden, dated July 4, 2023*, attached as part of Group Exhibit A.

A friend of Dan's for over forty years, Elaine Cloney, writes of her friend:

> Dan is always there to help people when he is needed, and they always know he cares. If someone loses a loved one, Dan will be at the services to support family and friends. Dan will reach out to me when he knows I'm going through even the smallest of problems. He wants to see if we are doing ok. Dan is one of my husband's best friends. My husband has had many surgeries and suffered through many depressions in the past. Dan would make sure to call him, visit him, or take him away for a weekend to raise his spirits. If it wasn't for Dan, I don't know what myself and my children would have done.

> Dan and his wife Linda have a strong loving marriage. They raised two sisters which they adopted from another country. Dan and Linda gave these two girls a life they would never had. They are both young adults now, and Dan is always there for them. He recently spent weekends fixing up his youngest daughter Elana's new little home. His children need him and love him so much.

*Letter of Elaine Cloney, dated July 14, 2023*, attached as part of Group Exhibit A.

It is clear from the letters, that Dan Leyden is a man for others. Helping those in need was instilled in him from a young age and it has become a way of life for him. His friend Roy Day remarks upon this in his letter:

> Dan has a knack for befriending elderly people at the grocery store, then paying for their groceries before he leaves .  .  . Throughout the years they have anonymously dropped groceries, and Christmas presents to families in need. That is one of their specialties. Dan and Joe think with their hearts, not their heads. For instance, on one occasion they decided to cross three lanes of traffic on the expressway, to rescue a stray dog from being hurt.

*Letter of Roy Day, undated*, attached as part of Group Exhibit A. Roy Day's letter is reminiscent of the great lesson of the book *The Little Prince* by Antoine de Saint-Exupery, "It is only with the heart that one can see rightly; what is essential is invisible to the eye."

Continuing this theme, Dan's nephew Joseph Lotus, writes movingly of Dan's empathy:

I will share a rather personal story that might shed some insight on Danny's character. I struggled with the truth about my sexuality through my early adult life and had resolved that I would never tell my family about how I felt unless I absolutely had to, However, in 2017, I had a life experience that showed me that my concern for being rejected was of little significance to the people who loved me – at that time, my father was in a medically-induced coma after suffering a severe heart attack. As I told my personal story I was shocked and relieved at the abundance of support and reassurance from family and friends, but it was Danny's response that hit me the hardest, and in a good way. He looked me in the eyes and said, "*You must have been hurting, and I never knew, or I would have been there for you.*" Of all the responses, not only was he incredibly supportive but he was the first to acknowledge the pain I had been in by not sharing my story. This is Danny Leyden I know, and I would be hard pressed to find a more empathetic person.

*Letter of Joseph Lotus, dated July 4, 2023*, attached as part of Group Exhibit A. (emphasis added).

Dan's daughters Tatyana and Elena write the Court about their father:

My name is Tatyana Leyden, daughter of Daniel Leyden. I am writing this letter on behalf of my sister, Elena Leyden and I. My sister and I were adopted from Russia approximately 16 years ago. My dad is a very kind person and has helped my sister and I from fixing our toys when we were little to fixing bigger problems from our teenage years to our early adult lives. He has always been there for us. He has taken me to volleyball tournaments, and school events and has been my biggest supporter through it all. He is always there for us whenever we need him even if it is just for a phone call. He has welcomed everyone that has stepped into our house and is always smiling and goofing around with my sister and I.

When my parents realized that my sister, Elena had a learning disability my father did whatever he could to get her into the proper schools to get the support she needed. He has always pushed my sister and I to be better versions of ourselves and has always taken time out of his day to make sure we are happy and get everything we need in our lives. I have recently moved back home to finish my schooling and pursue my career in teaching. My father still plays a big role in supporting my sister and I mentally, spiritually and financially. During this sentencing process I hope you can take everything my sister and I have said into consideration and grant leniency for my father.

*Letter of Tatyana and Elena Leyden, undated February 4, 2022*, attached as Exhibit B.

Having reviewed the background of Daniel Leyden and the impact of his loss on his loved ones, let us return to the law of sentencing and the question Congress—and the Constitution—put before the Court: Is it necessary, in order to address the legitimate purposes of sentencing, to impose a prison sentence against Mr. Leyden? The answer is clearly no.

## ARGUMENT

United States Probation Officer Macy Mullins calculated Mr. Leyden' potential guideline sentence. Based upon this calculation, Mr. Leyden is facing a range of punishment of 63-78 months

imprisonment. As this Court knows, the guidelines are now only advisory. The factors of §3553(a), addressed below, demonstrate why probation is a punishment which is "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced" in this matter. *Kimbrough*, 552 U.S. at 111.

### 1. The Nature of the Offense and the History and Characteristics of Defendant

#### a. Nature of the Offense

Mr. Leyden plead guilty to guilty to a single count of Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). Nothing that is said in this section is meant to diminish this. However, his past history, his actions that day and the limited nature of his involvement in the January 6 riot shed light on why he is an excellent candidate for a non-custodial sentence.

#### b. History and Characteristics of the Defendant

Mr. Leyden is an individual with no criminal history points, a lifetime of lawful actions, and over thirty years of work and employment history behind him. He has been involved in numerous personal acts of charity, both big and small. He is a hard-working family man, and he has built throughout his life a strong reputation as a genuine and loving person and by all accounts, a good husband and father.  Mr. Leyden now stands before this Court because he has committed a crime and he has no excuse for this behavior.

The Court has been provided with a multitude of letters in support of Mr. Leyden. The letters come from Mr. Leyden' family, friends, and colleagues. The letters submitted show that Mr. Leyden is a good and kind person who is worthy of the mercy of this Court.

The letters also show the devotion of Mr. Leyden to his family, friends, and his colleagues. It is clear from the content of these letters that Mr. Leyden is willing to offer assistance to family, friends, and strangers. The letters highlight the history and characteristics of Mr. Leyden that this court should take into account as part of the of §3553(a) considerations.

The letters attached to this brief, both individually and read in total, tell the story of a man who has lived a rather exemplary life, who went from exercising his constitutional rights to being swept up in the crowd and committing this crime. As evidenced by his guilty plea, Mr. Leyden found out too late that he was going from lawfully protesting to being part of a mob and failed to take action to remove himself from it. Mr. Leyden is not characterized by his desire for a "flashy" lifestyle or "material" needs. As is evident in the letters, Mr. Leyden values time with people and close relationships. He understands how hard the world can be and never forgot that in forging his relationships. The attached letters provide instance after instance of Mr. Leyden giving of himself for others, putting their needs over his.

### 2. The purpose of Sentencing

As noted in the Presentence Investigation Report by Probation, Mr. Leyden has led a life really without blemish until the circumstances surrounding the case at bar. Mr. Leyden is a patriot whose love of country is unquestioned and, as such, Mr. Leyden is embarrassed by his behavior here and feels that he has let his country down.

### a. The need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Mr. Leyden readily acknowledges the seriousness of this offense. The question of "just punishment" is, however, the overarching question in this case. Mr. Leyden suggests that a sentence of twelve months of house arrest followed by thirty-six (36) months' probation and 200 hours of community service fulfills the objectives of promoting respect for the law and in providing just punishment for this offense. Any sentence of imprisonment is not necessary in this case to "reflect the seriousness of the offense" or to "promote respect for the law." After a life of being a good person and a good citizen, Mr. Leyden, as a result of his own foolishness and criminal behavior, will have his family, friends and colleagues be witness to his disgrace and downfall. It is a situation that has greatly affected both Mr. Leyden and his family, including the loss of his job. Additionally, Mr. Leyden showed early and complete acceptance of responsibility for his conduct.

### b. The need to afford adequate deterrence to criminal conduct.

Deterrence is a factor to be considered in relation to the public at large as well as a factor to consider specific to Mr. Leyden. A sentence of twelve months of house arrest followed by thirty-six (36) months' probation and two hundred hours of community service is more than adequate to provide a deterrent effect to the general public. As the facts of this case have shown, Mr. Leyden was an honest and hardworking man whose failure to withdraw from the January 6 mob has put the well-being of his family in jeopardy. He will stand as a convicted felon and face severe financial penalties. He has lost his job of over twenty years because of his actions that day. Such a sad end would await others who think about committing such a crime. A sentence of twelve months of house arrest followed by thirty-six (36) months' probation and two hundred hours of community service will accomplish the goals of general and specific deterrence. Mr. Leyden will stand as the prime example for others to steer clear of any involvement in any type of wrongdoing.

### c. The need to protect the public from further crimes of the defendant.

The unique circumstances of this case are unlikely to be repeated, and Mr. Leyden's behavior in business and in his personal life up to this point has been exemplary. The facts of this matter are an extreme aberration from a lifetime of choices marked by character and dignity, and there is no evidence to suggest that recidivism is a concern. *See United States v. Roth,* No. 05 CR 792-5, 2008 U.S. Dist. LEXIS 19603, *3-4, 7 (N.D. Ill. Mar. 11, 2008) (the court departed from guidelines range of 63 to 78 months to probation on the charge of making materially false statement to the FBI due, in part, to defendant's remorse and absence of criminal history, all of which indicated there was no threat of recidivism).

### 3.     The Kinds of Sentences Available

This Court may exercise its discretion to consider a variety of alternatives to the term of imprisonment sought by the government or called for under the Guidelines. 18 U.S.C. §§ 3553(a)(3), 3561(a)(1). Furthermore, the Supreme Court in *Gall* specifically noted that the severity of a sentence of probation should not be underestimated, stating:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights,* 534 U.S. 112, 119 (2001) ('Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which ever citizen is entitled.') (*quoting Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Probationers may not leave the judicial district, move or change jobs without notifying and in some cases receiving permission from, their probation officer or the court. They must report regularly to their officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual 'special conditions' imposed by the court.

552S. at 48 (footnote omitted).

### 4.       The Need to Avoid Unwarranted Sentence Disparities

Mr. Leyden clearly understands that his conduct was reprehensible; that he should have left after then-President Trump concluded his speech; that being associated with this mob will forever challenge his sense of being an upright citizen and will also compromise his standing in the community.

The many letters from people who know him best, describe Dan Leyden as a man who gives of himself to those who need help. They also give substance to the diversity and uniqueness of those who participated in the January 6 riots. The letters challenge the archetype of those who participated in this awful day. Leyden is described as gentle and loving. A man who gives selflessly and his only benefit is knowing he helped another who needed it. Dan does not belong to any social media platforms. He has complied fully with pretrial supervision. He is described by his friends as contrite and regretful of his activity. He is described as one who infinitely respects police authority, and the necessity and value police bring to our society. He chauvinistically is an American and wants the best for her in all her trials.

Dan Leyden continues to question himself and his recklessness and conduct on January 6, 2021. He continues to be mystified by why he did not just turn and walk away from the mob. Nonetheless, he accepts punishment and sanctions this Court deems reasonable and necessary. It is this reasoned resignation that should give this Court assurance that the need to deter, incapacitate and rehabilitate is not as pressing as they are with other January 6 defendants.

Nonetheless, punishment remains. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of

14

Sentencing, Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Finally, the need for rehabilitation cannot be met by jailing Mr. Leyden. "Imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Accordingly, these factors weigh heavily in favor of a sentence far below the advisory guideline range.

Sentencing parity between similarly situated co-defendants should be taken into account in setting the appropriate sentence. Many defendants arrested and prosecuted on January 6, have been found guilty of 18 U.S.C 111(a)(1) assaultive conduct. Mr. Leyden's conduct that day is clearly distinguishable and lesser in degree to all others who have received sentences thus far. Defendants such as:

*Logan James Barnhart*, 21 CR 35-6 – Assaulted Metropolitan Police officer with a **baton flagpole and crutch** – 36 months

*Aiden Henry Bilyard*, 22 CR 24-1 - **Sprayed officers with "bear spray"** incapacitating them, shattered windows of capital with a bat – 40 months.

*Scott Fairlamb*, 21 CR 120-1 **Struck an officer and carried a weapon** – 44 months.

*Nicholas James Brockhoff*,  21 CR 524-1 - **Sprayed officers with fire extinguisher**, forced entry – 36 months.

*Devlyn Thompson*, 21 CR 461-1 - **Striking officers with weapons and forcibly taking riot shield** - 46 months.

*Daniel Ray Caldwell*, 21 CR 181-1 – **Sprayed up to 15 officers with some type of mace or pepper spray** – 68 months.

*Nicholas Languerand*, 21 CR 353-1 – **Assaulted officers by throwing objects at them** – 44 months.

*Mason Joel Courson*, 21 CR 35-8 – **Assaulted officer with baton, flagpole, and crutch** – 57 months

*Mitchell Todd Gardner II*, 21 CR 622-1– Damaging a capital window and **spraying officers with pepper spray** – 55 months.

*Kevin Creek*, 21 CR 645-1 - **Grabbing, striking, and kicking officers** – 27 months.

*Robert Gieswein*, 21 CR 21-1 – **Assaulted officers with spray and a bat** – 48 months

*Greg Rubenacker*, 21 CR 193-1 - **Chasing an officer with the mob up and down Capitol steps, threw water bottle at an officer**, and posted outrageous behavior of events on social media – 41 months.

*Cody Mattice and James Mault*, 21 CR 657 – 1 & 2 – **Spraying chemical irritant at police** – 44 months.

*Rickey Willden*, 21 CR 50-1 - **Sprayed can of chemical irritant at police and threw can at police** – 24 months.

*Howard Richardson*, 21 CR 721-1 - **Beat officer with a flagpole** – 46 months.

*Josiah Kenyon*, 21 CR 726-1 – **Assaulted officers with a broken table leg with a nail protruding from it** – 72 months

*Charles Bradford Smith*, 21 CR 567-2 - **Carried a club in the Capitol, verbally threatened and stormed barricade against officers** – 41 months.

*Christian Matthew Manley*, 21 CR 691-1 - **Assaulted officers with a metal rod and pepper spray** – 50 months

*Alan Byerly*, 21 CR 527-1 - **Possessing and threatening officer with a taser gun and striking officer physically** – 34 months

*Kyle James Young*, 21 CR 291-3 – **Among a group who assaulted, knocked down and tased an officer on the scene** – 86 months.

*Duke Edward Wilson*, 21 435-1 – **Beat officers with a PVC pipe** – 51 months.

*Gregory Lamar Nix*, 21 CR 678-1 – **Beat officers with a flagpole** – 42 months.

All the rioters' offense conduct noted above is all distinguishable from the conduct of Mr. Leyden. Additionally, many belonged to subversive groups, came with an intent to cause trouble, carried real weapons, and posted and crowed about this reprehensible behavior on social media shortly after it happened. Indeed, of the twenty-three examples presented above that involved demonstrably worse behavior than Daniel Leyden's. Punching police officers, hitting them with pipes, flagpoles, metal rods; assaulting officers with bear spray; stealing officers' equipment – horrible and violent behavior. Yet in all but one of the examples presented here, the sentences received by these violent defendants are *less than the guideline range Daniel Leyden faces in the case at bar.*

Other cases involving worse conduct than that of Daniel Leyden are:

*Mark Leffingwell*, 21 CR 005-1 - **Punching two officers while inside Capitol Building** – 6 months. Leffingwell, after entering the Capitol, he stood at the front of the crowd of rioters behind him, Leffingwell chanted not only "stop the steal!" but also "shame!" and

"join us!" directed at the police officers standing in front of him. Appearing to respond to the pleas of the line of officers, some of the crowd began to call back to the rioters behind them to "back up!" Rather than back up, Leffingwell called out for the rioters to stand their ground, shouting "If you back up, you'll never get back in!" At that point, the line of officers began pressing on the crowd, including Leffingwell, to back them out of the threshold of the Senate Wing doors. Leffingwell first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more. *See Mark Leffingwell, 21 CR 005-1, Government's Sentencing Memorandum, Dkt. 31, pp. 6-8.*

*Troy Sargent*, 21 CR 258-1 - **Striking officer with open hand and posting about it on social media** – 14 months. Sargent attempted to strike a second officer and later bragged in a video that he recorded, "Alright, we're pushing them back. We got gassed, we got pepper sprayed, and I duffed a cop in the face." He then yelled at an officer, "What are you going to do? Gas us again?" In another cell phone video, recorded in front of a police line in a different part of the Capitol, showed Sargent berating officers in riot gear. Sargent appeared to call them "a bunch of fucking traitors," told the officers "you should be ashamed of yourselves, you took a fucking oath to the Constitution," and further said, "fuck you guys. You guys are either with them or with us."

On Facebook, Sargent confirmed that he thought he had punched a police officer. In messages sent to various people on January 6, Sargent wrote "I got pepper sprayed for punching a cop" that he "duff that cop out twice" after getting pepper sprayed, and that he "[p]unched the cop 3 times in their [visor]." In multiple Facebook conversations on January 8, sent to large groups of recipients, Sargent acknowledged heading for the front of the crowd of rioters after he saw police deploy tear gas into the crowd. He asked one friend, "Tell me somebody got video of me punching the cops in their visor," and bragged that "I got two hits in on the same rookie cop and then he maced me." Sargent elaborated, writing that "every time [the officer] came in his visor was all full of [mace] . . . I knew [he] couldn't see s*** so I just jumped out from behind somebody [,] punched him as hard as I could [right] in his [visor]." *See Troy Sargent, 21 CR 258-1, Government's Sentencing Memorandum, Dkt. 78, pp. 8-16.*

Leffingwell and Sargent's behavior was also far more egregious than Daniel Leyden's and yet their sentences of six and fourteen months, respectively, dwarf the guideline range than Daniel Leyden faces.

The case that is most akin to Daniel Leyden's is that of *United States v. Phillip Young, 21 CR 617-1.* Mr. Young, like Mr. Leyden, plead guilty in a blind plea to the same charge as the one at issue here. In that case, the government alleged that because he repeatedly pushed against the barricade against the officers, the defendant should receive the enhancement of use of a deadly weapon. Judge Dabney Friedrich disagreed finding that the government did not prove that the defendant intended to harm the police officers manning the barricade, likening the defendant's behavior to pushing on a door. The defendant received a sentence of eight months in prison. The behavior of the defendant in *Young* is unquestionably worse than the behavior of Daniel Leyden. As Images 6-9 show defendant Young was forcefully pushing the barricades against the police and later

letting the air out of the tires of a government vehicle parked on the grounds of the Capitol Building. As the government noted in its Sentencing Memorandum:

> Young stood on a portion of the Upper West Terrace below a set of steps. At the top of the steps, a line of Metropolitan Police Department ("MPD") officers stood behind a line of metal bike racks serving as a barricade. Young remained below the barricades as other rioters arrived and the crowd grew larger. At one point, Young spoke to officers defending the Capitol, but his words were indiscernible.

> As the crowd continued to grow, Young grew agitated, extending his hand and saying "24, 25, 30, I don't fucking get it," as if to question the number of law enforcement officers present.

> At approximately 2:46 p.m., another rioter yelled "one, two, three go!" As a group, the rioters, including Young, pushed forward. Young rushed up the stairs and grabbed the barricade. Young, along with several other rioters, lifted the barricade off the ground and pushed it into MPD officers K.T. and J.R.

> As some officers absorbed the force of the barricade, others reacted by using pepper-spray against the rioters, forcing Young and the other rioters back down the steps. Young remained in the area, visibly angry, and agitatedly asking the officers "Really? Really? Fucking A!". At approximately 2:50 p.m., Young again aggressively spoke to the officers, though the audio of the body worn camera did not pick up what is said. Despite the efforts of Young and others, law enforcement was able to replace the barricades and maintain the security line.

> By around 3:12 p.m., the crowd size had grown appreciably around Young. At approximately 3:19 p.m., the rioters were told by law enforcement to get back. One of the rioters who refused the command was pepper sprayed. Angered by the police efforts to control the crowd, Young joined the throng of rioters and pushed the barricade forward for a second time. The crowd was sprayed again, and Young and the others backed up . . . Law enforcement was ultimately able to hold the rioters back and the attempted breach was unsuccessful.

> Eventually, Young left the Upper West Terrace, and made his way to the east front of the Capitol. At approximately 3:54 p.m., Young approached the tires of a government vehicle parked on the grounds of the Capitol Building and let the air out of one of the tires.

*See United States v. Phillip Young, 21 CR 617-1, Government Sentencing Memorandum, Dkt. 35, Pp. 3-8.*



*Image 6*, Defendant Phillip Young forcefully pushing barricade against Capitol Police Officers. *United States v. Phillip Young, 21 CR 617-1, Government Sentencing Memorandum, Dkt. 35, Pp. 3-8.*



*Image 7*, Another view of Defendant Young forcefully pushing barricade against the officers. *Id.*



*Image 8*, Defendant Phillip Young picking up barricade after being pepper sprayed.
*Id.*



*Image 9*, Defendant Phillip Young, letting air out of the tires of a police vehicle.
*Id.*

To reiterate, the defendant in Young *forcefully* pushed the barricades against the Capitol Police officers on *two* separate occasions, once after being pepper sprayed. He was belligerent towards the officers and later continued to create mayhem by letting the air out the tires of a police vehicle. It is beyond dispute to even the most casual observer that while Young and Mr. Leyden plead guilty to the same crime, their respective actions are not even in the same ballpark.

It is understood, certainly, that every defendant is distinguishable from the other. However, Mr. Leyden never came to make trouble, never physically touched an officer, never made threats against them, never intended to hurt anyone, and has been unabatedly contrite, and remorseful

20

about his behavior. Avoiding sentencing disparity is warranted in this case and these similarly situated co-defendants. *See, United States v. Parker*, 462 F.3d 273, 277-278 (3d. Cir. 2006) Although §3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so. So long as factors considered by the sentencing court are not inconsistent with those listed in § 3553(a) and are logically applied to the defendant's circumstances, we afford deference to the court's "broad discretion in imposing a sentence within a statutory range." 278 *Booker*, 543 U.S. at 233, 125 S.Ct. 738; accord *Cooper*, 437 F.3d at 330 (quoting *United States v. Williams*, 425 F.3d 478, 481 (7th Cir.2005)). Section 3553(a) both "sets forth numerous factors that guide sentencing" and "guide[s] appellate courts ... in determining whether a sentence is unreasonable." Booker, 543 U.S. at 261, 125 S.Ct. 738. Where appropriate to the circumstances of a given case, a sentencing court may reasonably consider sentencing disparity of co-defendants in its application of those factors. See *Koon v. United States*, 518 U.S. 81, 109, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (noting pre-*Booker* that unless the Guidelines explicitly prohibit downward departure on a particular ground, the sentencing court must determine whether the facts of the case warrant departure on that ground); see also *Menyweather*, 447 F.3d at 633.

## V.      MOTION FOR SENTENCE BELOW THE GUIDELINE RANGE

Mr. Leyden respectfully requests that the Court impose a sentence below the guideline range established in the PSR. Mr. Leyden is requesting that he be sentenced to a term of twelve months of house arrest followed by thirty-six (36) months' probation and two hundred hours of community service

## VI.      CONCLUSION

The Court is bound—morally and constitutionally—to impose no harsher sentence than what is truly and objectively necessary to achieve the legitimate purposes of sentencing. The Supreme Court has now made it clear that district court judges can again consider as judges what they know as human beings—that a sense of moral proportion does not have to be left outside the courtroom door.

Clearly, Mr. Leyden should not have been involved in any type of mob behavior but prior to this matter he had led a life of hard work and commitment to his family and community.

We ask that this court impose a lenient sentence, so as not to punish Mr. Leyden, or his family, any further. The court should use its broad latitude to fashion a non-guidelines sentence for Mr. Leyden, no harsher than truly and objectively necessary. 18 U.S.C.§ 3553(a); See also, *United States v. Reyes*, 557 F.3d 84, 87 (2d Cir. 2009). For the foregoing reasons, Daniel Leyden respectfully suggests that a sentence of twelve months of house arrest followed by thirty-six (36) months' probation and 200 hours of community service is sufficient but not greater than necessary to achieve the statutory objectives set forth in 18 U.S.C. § 3553 and comports with the considerations set forth in the United States Sentencing Guidelines.

Respectfully submitted,

                                                    DANIEL LEYDEN

                                            By:     s/Thomas More Leinenweber
                                                    Thomas More Leinenweber

Thomas More Leinenweber
Leinenweber Baroni & Daffada, LLC
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
(312) 606-8705
thomas@ilesq.com