## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-314-001 (TNM)** |
| **DANIEL F. LEYDEN** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Daniel F. Leyden to 72 months' imprisonment, 36 months' supervised release, $2,000 restitution, and $100 mandatory assessment. The government's recommended sentence of imprisonment falls slightly above the mid-point of the 63 to 78-month guidelines range as calculated by the government and the United States Probation Office.[1]

### I.    INTRODUCTION

The defendant, Daniel Leyden ("Leyden"), participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9

---

[1]   As discussed below, in the guilty plea agreement, the parties substantially agreed to the calculation of the guidelines. But while Leyden agreed that a metal crowd control barrier is a dangerous weapon and further agreed to the facts as stated in the Statement of Offense, he reserved his right to contest the enhancement for use of a dangerous weapon, pursuant to U.S.S.G. § 2A2.2(b)(2)(B), solely on the grounds that his use of a metal crowd control barrier did not involve the intent to commit bodily injury.

million dollars in losses.[2]

Leyden traveled to Washington, D.C. with his brother, co-defendant Joseph Leyden, to participate in the "Stop the Steal" rally planned for January 6. Leyden and his brother left the rally and marched to the U.S. Capitol, where Leyden was at the forefront of the mob that rushed the barricades set up by U.S. Capitol Police ("USCP") at the Peace Circle. Leyden was one of the handful of rioters directly responsible for the failure of the Peace Circle barricade, and his actions caused significant bodily injury to USCP Officer N.R. It is not hyperbolic to say that Leyden's collapsing of the police line at Peace Circle helped set the mob's tone for the rest of January 6.

The government recommends that the Court sentence Leyden to 72 months' incarceration for his conviction of violating 18 U.S.C. § 111(a)(1), a sentence which reflects the gravity of Leyden's conduct, but also acknowledges his admission of guilt and other personal characteristics.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 32, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.**     **Leyden's Role in the January 6, 2021 Attack on the U.S. Capitol**

Leyden lives in Chicago, Illinois. On January 5, 2021, Leyden, his brother and co-defendant Joseph Leyden, and others traveled from Chicago, Illinois to Washington, D.C. to attend the former President's rally.

On January 6, 2021, Leyden and his brother attended the rally, but left about an hour before then-President Trump finished speaking and marched with a group to the Capitol. At approximately 12:45 p.m. a large crowd gathered to the west of the Capitol around the Peace Monument, located in the Pennsylvania Avenue, NW and 1st Street, NW roundabout.   This area is commonly referred to as the "Peace Circle." At approximately 12:50 p.m., the crowd approached the first fence line erected on the perimeter of the Capitol Grounds. *See* Image 1.



*Image 1* (Sent. Ex. A)

After breaching that line of fencing, the crowd then approached a second line of barricades manned by uniformed USCP officers. The second line of barricades was constructed of metal bike racks, physically linked end to end, and reinforced with plastic mesh safety fencing that was

affixed to the racks. Clearly visible on the bike racks were large signs that read "AREA CLOSED." *See* Image 2.



*Image 2* (Sent. Ex. A at 0:13; Leyden circled in yellow, Officer N.R. circled in green)

Leyden was one of the first rioters to approach the barricade, and he put his hands on the bike racks directly in front of Officer N.R. *See* Images 3-4.



*Image 3* (Sent. Ex. A at 0:19)



*Image 4* (Sent. Ex. A at 0:25)

The USCP officers attempted to fend off the approaching rioters, who were pushing the metal barricade and attempting to assault officers. From his place at the front of the crowd, Leyden was in prime position to assist in achieving the crowd's goal of pushing past the metal barricade. As seen in Exhibits B and C, Leyden turned and put his back to the bike racks, lifting up the barricade with other rioters, and put his full weight into pushing the police line back and out of the way of the mob[3]. Leyden and other rioters repeatedly lifted and pushed the barricade until the line broke and the mob swept past the barricade and USCP officers. *See* Images 5-8.

---

[3]   The PSR notes that Leyden is 5'8" tall and weighs almost 200 pounds. PSR ¶ 62.



*Image 5* (Sent. Ex. B at 0:08)



*Image 6* (Sent. Ex. C at 0:10)



*Image 7* (Sent. Ex. C 0:11)



*Image 8* (Sent. Ex. C 0:13)

USCP Officer N.R. was one of the officers at the Peace Circle and was physically holding

the bike rack with her hands, as she and other USCP officers defended the barricade from the mob.

As can be seen in Exhibit C, Officer N.R. directly engaged with rioters attempting to break through

the barricade. Leyden's use of his body weight, and his encouragement of other rioters to do the same, eventually overwhelmed the USCP officers, including Officer N.R., and caused the collapse of the barricades. In doing so, Leyden pushed the barricade onto Officer N.R., causing her to fall backwards, landing under the barricade, pinned and restrained there. As a result, Officer N.R. sustained bodily injuries, including a significant injury to her knee. Specifically, Officer N.R.'s left knee became trapped when she attempted to free the knee and suffered serious injury to that knee. Due to the injuries Officer N.R. suffered, she was forced to take one week off work and had to fill out a workers compensation claim. Leyden made no effort to help Officer N.R. after he realized she was trapped under the bike rack, as can be seen in Exhibit C.

Other USCP officers were also injured by the rioters' actions at that time, including Officer C.E. who fell backward, was trapped under the bike rack barricade after its collapse, and suffered a concussion. Officer C.E. suffered a severe head injury from which she continues to experience symptoms, including random losses of consciousness.

After successfully dismantling the barricades with other rioters, Leyden got up on a low wall along the sidewalk leading to the Capitol Building, and marched with the mob toward the Building, his arms raised in celebration. *See* Image 9.



*Image 9* (Sent. Ex. B at 1:13)

Leyden eventually made it with the mob to the West Plaza, where he witnessed the rioters engage in further violence and assaultive conduct on law enforcement. After the barricade fell, Officer N.R. Retreated to the West Plaza, where she spent about an hour and a half defending the Capitol from an overwhelming crowd of rioters on an injured knee and without the personal protective equipment that the situation warranted. Then, she went inside the Capitol Building and worked to get rioters out. Officer N.R.'s heroic actions were only necessitated by Leyden's initial breach of the restricted perimeter, which allowed the mob onto Capitol Grounds.

## III.   THE CHARGES AND PLEA AGREEMENT

On August 10, 2022, the government filed a Complaint charging Daniel Leyden and Joseph Leyden with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, and Aiding and Abetting, in violation of 18 U.S.C. §111(a)(1) and (b), and 2 and other offenses.

On September 21, 2022, a federal grand jury returned an eleven-count indictment charging Leyden and his brother Joseph Leyden. Leyden was charged in six counts:

Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting

Bodily Injury, in violation of 18 U.S.C. §111(a)(1) and (b) (Count One);

Civil Disorder, in violation of 18 U.S.C. §231(a)(3) (Count Two);

Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §1752(a)(1) and (b)(1)(A) (Count Five);

Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §1752(a)(2) and (b)(1)(A) (Count Seven);

Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(4) and (b)(1)(A) (Count Nine); and

Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. §5104(e)(2)(F).

On May 24, 2023, Leyden was convicted of the lesser included offense in Count One of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Leyden now faces sentencing for his conviction of Assaulting, Resisting, or Impeding Certain Officers Inflicting Bodily Injury, in violation of 18 U.S.C. §111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

In the plea agreement, the parties substantially agreed as to the calculation of the guidelines, but "agreed to disagree" on the application of U.S.S.G. § 2A2.2(b)(2)(B), which

provides a four-level enhancement to the Aggravated Assault guideline if a dangerous weapon was

used.   As summarized in the plea agreement:

> Stipulated Guidelines
>
> | U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
> |---|---|---|
> | U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
> | U.S.S.G. § 2A2.2(b)(3) | Bodily Injury | +3 |
> | U.S.S.G. § 3A1.3 | Restraint of Victim | +2 |
> | U.S.S.G. § 3A1.2 | Official Victim | +6 |
>
> Contested Guidelines
> | U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
> |---|---|---|

*See* Plea Agreement (ECF 31) at ¶¶ 5(A).

The Section 2A2.2(b)(2)(B) enhancement appears as both "Stipulated" and "Contested"

because, as explained in the Plea Agreement, Leyden agreed:

> [T]hat pursuant to § 2A2.2(b)(2)(B), a dangerous weapon includes any instrument that is
> not ordinarily used as a weapon if such an instrument is involved in the offense with the
> intent to commit bodily injury.   Your client further agrees that a metal crowd control
> barrier is a dangerous weapon and to the facts as stated in the Statement of Offense, but
> reserves the right to challenge the application of § 2A2.2(b)(2)(B) solely on the grounds
> that his use of metal crowd control barrier did not involve the intent to commit bodily
> injury.

*Id.*[4]

The Probation Office agreed with the government's calculation of the guidelines and

included the Section 2A2.2(b)(2)(B) enhancement:

> Count One: 18 U.S.C. § 111(a)(1)
>
> | U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
> |---|---|---|
> | U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
> | U.S.S.G. § 2A2.2(b)(3) | Bodily Injury | +3 |
> | U.S.S.G. § 3A1.2 | Official Victim | +6 |
> | U.S.S.G. § 3A1.3 | Restraint of Victim | +2 |

---

[4] Application Note 1 to Section 2A2.2(b)(2)(B) provides that "'Dangerous weapon' has the
meaning given that term in § 1B1.1, Application Note 1, and includes any instrument that is not
ordinarily used as a weapon (*e.g.*, a car, a chair, or an ice pick) if such an instrument is involved
in the offense with the intent to commit bodily injury.'"

| | |
|---|---|
| Adjusted Offense Level (Subtotal) | 29 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-3</u> |
| **Total Offense Level:** | **26** |

PSR ¶¶ 35-47.

The deadly weapon enhancement in U.S.S.G. § 2A2.2(b)(2)(B) applies in the case, because the facts and circumstances of Leyden's assault show that he used the bike rack with an intent to commit bodily injury. A factfinder may infer someone's intent from the surrounding circumstances, and may consider any acts done by the defendant, and all other facts and circumstances which indicate his intent; further, a factfinder may infer that a person intends the natural and probable consequences of his acts. *See* Redbook Instruction 3.101, Proof of State of Mind. Here, Leyden and the other rioters knew the USCP officers were manning the barricade and were physically pushing back against the mob's attempts to break through. Despite this, Leyden put his back to the barricade and used the full force of his considerable weight to lift and push the bike racks into USCP officers, including Officer N.R. who was standing directly behind Leyden.

As is clear in the Images above, neither Officer N.R. nor any other officer behind the bike racks was wearing a helmet or any other protective gear—nothing to protect them from injury upon being toppled over, knocked off balance to the concrete, pinned under the bike rack, even possibly in danger of being trampled by the mob. Given the weight and composition of the bike racks, and the likelihood of injury to Officer N.R. and the other officers upon being knocked off balance to the concrete, it is clear that Leyden intended his actions to cause bodily harm. Indeed, Officer N.R. was not the only officer who was injured; other officers were injured as well. Moreover, unlike other rioters on one end of the fallen barricade, Leyden saw N.R. fall to the ground and made no effort to make sure she was okay or unhurt, which shows Leyden's intent to

12

cause harm. *See, e.g., United States v. Barai*, No. 20-10318, 2022 WL 17819120, at *4 (9th Cir. 2022) (district court did not abuse its discretion in applying four-level enhancement for use of a dangerous weapon where defendant pushed nanny into stove, where, *inter alia¸* "despite being a doctor and causing the burn, [defendant] did not offer assistance after [the nanny] was burned".). Rather, Leyden raised his arms victoriously and marched closer to the Capitol Building, leaving Officer N.R. on the ground in pain. Leyden's celebration is clear evidence that his intended goal was accomplished.

The U.S. Probation Office calculated Leyden's criminal history as category I, which is not disputed. PSR ¶ 51. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 26, Leyden's Guidelines imprisonment range is 63-78 months' imprisonment. Leyden's plea agreement contains an agreed-upon Guidelines range calculation that, if the Court imposes the dangerous weapon enhancement, mirrors the calculation contained herein.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Leyden's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. As previously discussed, Leyden was at the front of the initial charge of rioters toward the U.S. Capitol. Leyden personally led rioters in pushing the barricades and bike racks at the first breach of USCP defenses. Leyden's actions directly contributed to

officers N.R's injuries on January 6, 2021. The nature and circumstances of Leyden's offense were of the utmost seriousness, and fully support the government's recommended sentence of 72 months' incarceration.

### B.  The History and Characteristics of the Defendant

Leyden has no criminal convictions or arrest record.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Leyden's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Leydon's attorney advised the Probation Officer that "Leyden is sincerely remorseful for the conduct which led him to be charged, and he plans to express remorse to the Court," PSR ¶ 34, Leyden had no thought for the health or safety of the USCP officers he injured

---

[5]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

and trapped beneath the bike racks he toppled when he committed this crime. Indeed, as soon Leyden and other rioters pushed the bike rack barricade over, Leyden sped away and, with hands outstretched overhead in victory, marched closer to the Capitol Building. Joyous that he accomplished his objective of knocking down an obstacle in his path, Leyden did not check on Officer N.R., or any of the other officers knocked down and pinned under the barricade.  S*ee also United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Second, Leyden's conduct itself was brazen and showed a clear lack of respect for both the law enforcement officers he assaulted and the political process they protected. Leyden was not a bystander on January 6. Leyden knew the area was closed, saw USCP officers guarding the way to the Capitol Building, willingly ignored their lawful orders to stop, and maliciously pushed the obstacles in his way. Leyden's conduct has no excuse and the need for specific deterrence is great.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.   While no

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Stevens*, 21-cr-40 (TNM), after attending the former president's "Stop the Steal" rally, Stevens joined the crowd of rioters and walked to the West Front of the U.S. Capitol. Before the police line broke, Stevens approached officers and mocked them, yelled insults at them, and spit at their feet. Eventually, the police line on the West front broke. As police officers fell back, Stevens gave a thumbs up, indicating his approval for what he had sought all along: access to the Capitol. Stevens and others progressed forward until he came to the Tunnel. When other rioters made room, Stevens leaned into the people in front of him, applying his strength and weight to push the mob forward towards the tunnel doors. Stevens faced a guideline range of 70-87 months. This Court sentenced Stevens to 60 months' incarceration, 24 months' supervised release, and the $2,000 in restitution.

In *United States v. McGrew*, 21-cr-398 (BAH), the defendant attended the Stop the Steal, with the bear mace, before marching to the U.S. Capitol with other rioters. McGrew first joined the storming of the police line at the West Plaza, where he worked his way to the front of the crowd until he was face-to-face with officers near the foot of the inauguration stage. McGrew entered the Capitol through the unguarded Upper West Terrace doorway. Prior to entering, McGrew encouraged other rioters, repeatedly yelling, "Let's Go!" Within seconds of entering the Capitol, McGrew struck a MPD officer with his left hand and continued up the stairs. McGrew screamed at law enforcement officers and refused to follow instructions to leave the building. McGrew also struck several more officers, attempted to and successfully grabbed officers' batons, and locked arms with other rioters, in defiance of officers' commands that rioters leave the building. McGrew

faced a guideline range of 70 to 87 months of incarceration. The Court sentenced McGrew to 78 months' incarceration, 36 month's supervised release, a fine of $5,000, and the $2,000 in restitution. McGrew's conduct was similar to but worse than Leyden's conduct, and McGrew faced a similar but higher sentencing guideline range. Here, Leyden's conduct warrants a similar but slightly lower sentence.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer N.R., did suffer bodily injury as a result of Leyden's assault. The parties agreed, as permitted under

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(3), that Leyden must pay $2,000 in restitution, which reflects in part the role Leyden played in the riot on January 6.[9] Plea Agreement at ¶12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Leyden's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 93.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 72 months' imprisonment, 36 months' supervised release, $2,000 restitution, and $100 mandatory assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   */s/ Kyle M. McWaters*
Kyle M. McWaters
Assistant United States Attorney
D.C. Bar No. 241625
601 D Street NW
Washington, DC 20003
(202) 252-6983
kyle.mcwaters@usdoj.gov

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).